Mr. Kluge, good to see you this morning. Good morning, Your Honor. It's a pleasure to be here. This is a Medicare fraud case where the government had no patience. They had no patience as witnesses, and they had no patience for the normal judicial process for taking a plea from a defendant, and that's what is most novel about this case. Well beyond anything that is considered in any other circuit, the government introduced into this case to the jury the concept that the defendant had essentially pled guilty out of court, but that it had not gone through, and therefore, they had to have the jury ratify it. And there's something fundamentally improper about that, and the notion that the defendant . . . The problem though is that there was a waiver provision in the plea agreement, right? There was certainly a defective set of waivers in the plea agreement. For example, the primary document, the document that the government introduces, the waiver in the plea agreement says the attached document can be used in this case or in other cases. There was no attached document. In fact, the document didn't even exist at the time that the plea agreement was signed.  There was a draft that was inaccurate. Two weeks later, there's another document that comes out. It's called an agreed factual basis, but the government never agrees to it. And again, it's not like . . . it's called a confession, I think, by both parties in some ways, but it's not like a confession, and it wasn't identified to a defendant as a confession. It was identified to the defendant as a document that sole purpose was to be used in connection with a plea. It says so in the document. So it's not in any way within the standard of mezzanotto. There's a plea agreement that's signed, right, by both counsel and client? Yes, there is. And there's a waiver that's been agreed to as well, right? There's a waiver provision in the plea agreement. And why doesn't mezzanotto answer the question then? Well, mezzanotto, I think, certainly holds a key. There's three opinions in mezzanotto. I think if you look at the decision, the opinions of the five justices that I focus on, including Justice O'Connor, the differences here are you had an ongoing existing litigation in that case. They note that as being important. It was only introduced for impeachment purposes. They note that as being important. Again, this court has never held this type of, anything like this type of thing can be introduced for a case in chief. This court has never held that. And mezzanotto did not hold that. And another thing. So is your argument that you can't waive it for that purpose? I'm saying that you can't have an extrajudicial plea colloquy because it destroys something more fundamental than just the ordinary rules. It destroys a rule that is in place in order to create a prophylactic protection for the fundamental due process rights. My way of looking at it is . . . I don't know what that is. So there are all kinds of rules like that, like the right to a jury trial. You can waive that. But you can't . . . You can waive your right to counsel. You can waive all sorts of fundamental rights that are there to protect a defendant to a fair process. My answer is that you can't waive them on the eighth floor. You've got to come up to the 11th floor. You've got to come up to the 10th floor. And you've got to get in front of a judge. And that's been the law on all of those rights. And this is just as fundamental. The government has, in their brief, goes so far because there is such doubt that the defendant even understood what was going on. Because they didn't have the attachment there. They want to rely on the attorney that he had for this case that had not even been filed yet. And although I just realized that last evening, the Supreme Court decided a case a couple of months ago, McCoy v. Louisiana, where they said, where they finally resolved the issue that an attorney cannot, as part of his strategic thinking or her strategic thinking, essentially plead guilty for a defendant. So that part of the government's brief that said, well, the defendant didn't even have to know what was going on. The lawyer can walk into the prosecutor's office and basically bargain away his rights like a plea agreement. I think that's gone after McCoy, in my opinion. We argue that it was a stretch of an argument to make in our argument. So it basically comes down to, again, this concept of what kind of waiver and what kind of standard are we going to apply to a plea-like proceeding in which plea documents are introduced, court-written documents. The document the jury gets is the United States District Court, Southern District of Florida, agreed factual basis for the guilty plea. And the first paragraph is just complete conclusions of law. The defendant is guilty of the following offenses, the statute, just like an indictment. The follow-up end paragraph says this sole purpose of this document is for purposes of a guilty plea. And then the government uses it. It's one thing the government throws it in, even if they're using it in case in chief. If they throw it in in a case in chief at some later point where it's to respond to something, you could have some kind of sympathy, perhaps. But this was the very first thing they go to, the very last thing they go to. And at every point they use it. This is their case. This is the foundation of their case. All their evidence they describe as elements introduced to corroborate this plea, essentially, this extrajudicial, extra-court plea. So we think that it's so far beyond mezzanotto, certainly so far beyond anything this court has ever held. And even if it had been done perfectly, we would still take the same position, but it wasn't done right. That document they introduced didn't even exist at the time of the plea. They come back with, well, under the restatement, something of contracts, you can have an anticipation of a document to come on a memorialization, like some kind of business agreement. Again, and that just points up how fundamentally wrong this is. This court has never adopted that sort of business transactional contract law in relation to pleas. And even in those business transactional contract cases, you wouldn't have it apply to this case. Mr. Kluge, I want you to help me with my reading of mezzanotto. So I understand that case to say we have to look for a, quote, affirmative indication that the waiver isn't enforceable for some reason. And so I think that means the burden's on you to show that the waiver's unenforceable. Do you disagree with my reading of the case, or do you read it differently? No, I mean, I focus on the word affirmative indication as meaning that it doesn't take much for the defendant to overcome the waiver. I think that, I don't know, I think the government still has to establish that there was a valid waiver. I think what the court is saying is that . . . The attorney read, literally read, each provision to his client, right? Yes, but my view is that doesn't get him any farther than if he read it himself. I mean, he did read English. This is, yeah, but this is a client who has a college degree, right? Yes. Discussed with him any questions he had about it. He didn't have questions about this. And the attorney testified that there's no indication that he did not understand the waiver. And again, let's compare this to Mezzanato. Mezzanato, the fundamental waiver in Mezzanato is a one-on-one explanation by the attorney and the prosecutor to the defendant of the single point being the waiver. In other words, the explanation, the one-on-one waiver in Mezzanato is an actual interaction where it's explained to the defendant. And in that context, the court says, we have no affirmative indication. Here we have an admission by the attorney that he never explained this. And he said, as I understand his testimony, there would be no way that the defendant would have understood what these rules were. Because he never explained these, he never showed the rules to them, he never talked about the rules. Why wouldn't the trial judge who had the advantage of hearing the attorney testify about what did happen during the plea negotiations and had the advantage of hearing the defendant testify, why wouldn't the trial judge be in the best position to make that credibility determination? Well, if there had been a conflict, the government cites Gallego, for example, the case, the famous case of the conflict about the right to testify. And the attorney in Gallego testifies, I explained to him, it's your decision, you have the right to testify. There's an actual, and the defendant says, no, he never told me that. We don't have that here. The testimony insofar as it's relevant to this waiver decision is consistent. The attorney says, I never explained it to him. He has no basis to understand these rules. I never explained to him what these rules are, I never explained to him what this provision meant. In fact, I told him, the attorney, if you want the affirmative indication from Mazzanato, the attorney affirmatively tells him, what's the prospect of, what happens if you breach this agreement? You lose the benefit of the agreement. That's what he tells him. The agreement goes away. So the attorney did affirmatively misrepresent him. The client said nothing in conflict. There's no conflicting evidence to resolve. There's nothing to support the findings. That's why the government has reached on appeal to claim that the attorney could have done it himself, which, again, is not supported by Joshi in any way. Joshi was a trial decision. I do want to preserve my arguments on the sentencing issues, particularly the loss issue, which is one thing to estimate, but it's another thing to estimate on a theory that's never been supported by this court, or to my knowledge, any other court, that a minimal initial report referral for a patient means that whatever happened with that patient later on in life, it's a Medicare fraud. And if I can, as the court knows, I don't even treat the light as aspirational. But if I could just add to that. I wish you would. I know. Could I just, two seconds? No? I just want to mention the forfeiture issues. I think they're very, very important, and it's a very important area of the law right now. Okay. Mr. Robbins. Good morning, Your Honors. May it please the Court? My name is Alex Robbins, appearing on behalf of the United States. To get to the last point that he raised first, the government agrees that the forfeiture order needs to be vacated, right? We do, Your Honor. Under Honeycutt, the standard set forth in Honeycutt is that a defendant cannot be liable under the forfeiture statute for money that he did not personally benefit from, or he did not have an ownership interest in. There's no joint and several liability here. Correct. And so that issue needs to be remanded to the district court for the limited purpose of applying Honeycutt to recalculate the forfeiture order, based on the records already been developed in this case. Your Honors, Mr. Albablawi ran a massive $40 million mortgage fraud scheme in this case. He cooperated with the government for two years, and then he changed his mind before pleading guilty. In the course of that cooperation, he did a number of things that are not at issue in this appeal, that are not covered by Rule 410, even under the defendant's argument. He came in for multiple meetings where he confessed to special agents, to law enforcement, about what he had done, about the kickback scheme that he had run. He created two different lists, one handwritten and one where he put X's next to pre-printed doctor's names that he had done business with, according to Medicare's records. He made lists of doctors that he had paid kickbacks to, and the government said, please show us what doctors you pay kickbacks to. He went through and made a list of that. He created videos with doctors where he offered to have a kickback scheme as they did in the past, specifically referring to their past conduct together, which a number of the doctors accepted on video, and he had no innocent explanation for that. None of this. So this argument is, even if it was error to admit the confession, he was not harmed by it. Correct, Your Honor. I'm normally loathe to start with a harmless error argument because I think we have a winning argument on the merits of this, but just because my colleague, I think he said at one point, this is their entire case, is very far from that. The Rule 410 issue is not even limited to the words out of his own mouth. The words out of Mr. Albavoy's own mouth encompassed all these things that I just mentioned, all of which were more powerful than the three-page document drafted by a lawyer that he signed in anticipation of this plea agreement. So just to focus the court on what's at issue here, it is not all of the statements out of Mr. Albavoy's mouth, and we are not talking about anything close to effectively conceding the case. Now getting to the issue I think Judge Wood brought up about sort of the factual finding below, Judge Bloom had a two-day hearing in the district court where she heard from the special agent, she heard from Mr. Albavoy himself, and she heard from Mr. Albavoy's lawyer. And after that two-day hearing, she found that the lawyer was believable and Mr. Albavoy was not. So on page 90, for example, of document 177, day two of the transcript, Judge Bloom finds that no promises were made by the government to Mr. Albavoy in the course of the cooperation. She finds, quote, there was no doubt that the defendant entered into both documents, meaning agreements, knowingly and voluntarily. She says, quote, the court does not find credible the statement that he didn't understand certain terms in the agreement. And she says, quote, the court finds that you, Mr. Albavoy, had full knowledge of your actions and the consequences. And she had ample basis to make these findings because for over the course of the two-day hearing, Mr. Albavoy repeatedly testified to facts that were contradicted by the special agent and by his own lawyer. The most sort of obvious one is he said, Mr. Albavoy said, that his lawyer never discussed the guidelines loss amount with him. His lawyer testified that he did, and in fact, that was what Mr. Albavoy was particularly interested in, that he took down the guidelines and walked through the 2B1.1 loss amount. And even on appeal, on page 27 of their brief, the defense writes that that was what Mr. Albavoy discussed with his lawyer, was the guidelines calculation. Counsel, does it help, hurt, or matter at all that this agreement was signed before the defendant was charged with the crime and apparently before the exact document referred to as being attached was in fact attached? No, it doesn't, Your Honor, because the agreement itself, it refers to the factual basis. But the waiver provision at issue says the government can use any statements made by Mr. Albavoy, including the factual basis against him. So even if you take out that example, it covers the entire gamut of statements that could potentially be covered by Rule 410. I think it's worth pointing out that going through the day two of the testimony, Mr. Albavoy's testimony is repeatedly contradicted by things that the agent and his own lawyer said. He denies that he ever made a list of doctors he paid kickbacks to. He says he never told FBI agents that he paid kickbacks to the doctors. He initially says he didn't agree to plead guilty in his plea agreement when that's paragraph one. Although later on cross, he admits that he changed his mind and he said he didn't speak English well and was then impeached on that statement because he was married to someone who's booked English for years. He had hundreds of pages, I believe, of text messages with various people, with his co-conspirators and with agents that were all in English. The district court was on very solid ground finding Mr. Albavoy not credible and that fact was borne out throughout the trial afterwards. At one point in the record, Mr. Albavoy says that the government didn't produce him discovery when he was representing himself pro se and that the government simply gave him empty boxes and Judge Bloom says, no sir, I saw you last night. You were pulling files out of those boxes. They were not empty boxes. There was ample basis for the judge. Certainly it was not clear error for Judge Bloom to find Mr. Albavoy lacked credibility and did know what he was doing and did knowingly and voluntarily waive his rights under Rule 410. I would simply point out that another basis, yet a third basis here is that we take the position, as you know from our brief, that Rule 410 is simply not the rule of evidence. It doesn't even have the same waiver requirement as would, as Judge Breyer brought up, a waiver of a fundamental trial right, like a right to a jury trial or something of that nature. But if the court is willing to uphold Judge Bloom's finding as a factual matter, it need not reach that issue. With regard to the loss amount calculations, even if we assume, as I believe the record bears out, that someone testified that 90% of the patients were obtained through illegal kickbacks, on what basis do we then find that 90% of the losses were also based on illegal kickbacks or fraudulently submitted? The short answer to that question is that there's no suggestion in the record that there is any systematic difference between kickback patients and non-kickback patients. In other words, if the kickback patients and non-kickback patients are equivalent, then 90% of the number of patients is going to translate in 90% of the loss. That's actually, that's an astute statistical argument one could make. The defense did not make that argument and they're not making it now. Also as a practical matter, it would be unlikely that there would be any systematic difference between the kickback patients and the non-kickback patients because Mr. Al-Bablawi was essentially maxing out every patient as much as Medicare would get them. So when physical therapy would give the maximum Medicare reimbursement amount, each patient got 60 days of physical therapy. When diabetes in-home treatment would give the maximum Medicare reimbursement amount, then they would bill that. So everything was at the ceiling anyway for these patients or close to it, so that there's no reasonable probability that there would be any difference. Now Mr. Escalon is, I think the argument that Mr. Al-Bablawi is making on this point is not the one your honor made, it's a slightly different one which is, as I understand his argument, we know that maybe these patients didn't need the services anyway. So they came in through kickbacks, Mr. Escalon, the cooperator, says 90% of our patients came in through kickbacks, but perhaps some of these patients needed services anyway. As a factual matter, the Medicare, Mr. Condoza, the Medicare auditor who testified at trial testified that Medicare won't pay reimbursement for a patient that comes in as a result of kickback, period. And so as a factual matter, that's lost. Medicare wouldn't pay it absent the fraud. And I think that's our response to the argument that Mr. Al-Bablawi is making on this point. Once the court has any further questions, we ask that you affirm the judgment with the exception of a limited remand for application of honeycut. Thank you. Thank you.  Thank you, your honor. The, whether or not Mr. Al-Bablawi was found to be a liar at his, at the hearing really doesn't affect anything. I think that seemed to be the principle argument he's making that, the government's making that the judge found, got Mr. Al-Bablawi, got up on the stand and she didn't believe a thing he said. And that again, that doesn't really change the problem that the government has. The problem they have is they don't have, they didn't nail it down. If they want to go four steps beyond mezzanotto, at least nail it down, do it right. And then we'll have the argument about whether you can have an extra judicial plea. But they didn't do it right. They simply did not. They don't have the document that they want to introduce as on the grounds that they want to introduce it. Now they make the argument that, well, he said any statements that have been made, but that clearly, there was no suggestion at the hearing that that provision related to this factual basis. So that novel argument made an oral argument has nothing to do with this plea agreement, has nothing to do with the hearing. The hearing rests on the theory that he agreed to this factual basis. So shifting theories doesn't help the government either. It just illuminates the problem. And again, the problem is even if the lawyer had said, oh yeah, I did explain it to him, which he'd said he didn't. He said directly, I did not explain it to him. He didn't. He read every provision to him. I mean, that's what the district court could have found, right? I understand. But when you read the number 410 to a defendant, he understands the number 410. That's all he understands. He doesn't understand anything beyond that. And that's the problem. That's why in mezzanotto, there's an explanation of what they're talking about. Again, this is a narrow decision in mezzanotto. They're going three to four steps beyond it. The problem is it's more than just a slippery slope. This is off the slope. Because the effect of saying a defendant or, as they argue, a lawyer can walk into a prosecutor's office before charges are filed and agree to plead guilty in the prosecutor's office, have no plea hearing whatsoever. And then they go to a trial eventually, and the plea is just introduced, and everything about the plea is introduced. And the rest of the evidence that is introduced is to corroborate it. In terms of the evidence, the rest of the evidence is introduced. Again, I began by saying there are no patients. There's not a single patient who testifies. More importantly, there's not a single patient who was even interviewed. So this is a very special Medicare case. To say that it didn't have as its foundation both the factual basis and the two defendants who had pled guilty, the one defendant who had a grudge against him, who was very heavily impeached, Escalona, and the other, DeLisma, of course, which had the Brady violation on DeLisma. That's it. That's their case. So it is the factual basis, and you can see from the arguments when they say, this is our case. The rest of it's going to corroborate. It's not their entire case. No, that's true. There was, you know, they had a, Mr. Condoza testifies. Mr. Condoza, however, cannot change the guidelines. The guidelines do not rest on what Mr. Condoza thinks about an ambiguous statement about what Medicare allows. The notion that any time a patient has ever come into a clinic at any given moment to have a treatment, and that one time when they went in, there was one kickback made to somebody, that any other time they ever come back to that clinic, for the rest of their lives, that they can't go to that clinic, and they can't have Medicare coverage in that clinic, that's not what Mr. Condoza said, and there's a reason why, because that's not the law, nor is it the guidelines concept of the law. That's the point here. It is true that they also did not show a lot of mathematical theory that works out. They just used these rough numbers, said, if anybody came in at any time on a referral, even though for years their services had nothing to do with referrals, they may have changed doctors, whatever, it doesn't matter, we're still going to claim that it's loss. That's not supported by the guidelines at all. But most importantly, even if the attorney had said, I explained it to him, even if this had been mezzanotto, the court still should not let this happen. This has never been done before. If you do this, then you're basically saying . . . It seems to me that the defendant, though, is afforded more protection in this circumstance than when he confesses to an FBI agent, and all we have is the testimony of the agent about that confession. That happens all the time. At least there you have Miranda warnings usually for in custody confessions, or you have a circumstance . . . But maybe not a lawyer. Right. But here what you have is . . . Here you have a lawyer who signed the agreement with him. And never, again, never explained it to him, but what you have ultimately is, in any event, for due process purposes, an unconscionable agreement, the government saying, in order to enter a plea here, you must waive all of your rights under Rule 11. And basically it's all of them, because this is the same as a guilty plea when the court admits this document. We have your case, Mr. Klug. Thank you. We'll move to the second case.